

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,**

    **Plaintiff,**

v.

**DRIVE PLANNING, LLC, and
RUSSELL TODD BURKHALTER,**

    **Defendants,**

**And**

**JACQUELINE BURKHALTER,
THE BURKHALTER RANCH
CORPORATION, DRIVE
PROPERTIES, LLC, DRIVE
GULFPORT PROPERTIES LLC,
and TBR SUPPLY HOUSE, INC.,**

    **Relief Defendants.**

_____/

1:24-cv-07625
Judge John Robert Blakey
Magistrate Judge Young B. Kim
RANDOM/ CAT 5

Civil Action No. _____

# FILED

### AUG 23 2024 MCP

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**JURY TRIAL DEMANDED**

## NOTICE OF FILING COMPLAINT AND ORDER APPOINTING RECEIVER

NOTICE IS HEREBY GIVEN that on August 13, 2024, Kenneth Dante Murena, Esq. was appointed as Receiver over Defendant Drive Planning, LLC, in the following enforcement action pending in the United States District Court for the Northern District of Georgia: *United States Securities Exchange Commission v. Drive Planning, LLC, et al.*, Case No. 1:24-cv-03583-VMC (the "Enforcement Action").

Pursuant to 28 U.S.C. Section 754, attached herewith is a copy of the Complaint along with a copy of the Order Appointing Receiver, in which the District Court, among other things, appointed Mr. Murena as Receiver.

Dated:  August 22, 2024.

Respectfully submitted,

*Court-Appointed Receiver for*
*Drive Planning, LLC*
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone:  305-371-3960
Facsimile:  305-371-3965
kmurena@dvllp.com

*Kenneth D. Murena*_____
Kenneth D. Murena
Florida Bar No. 147486

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**(ATLANTA DIVISION)**

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DRIVE PLANNING, LLC and RUSSELL TODD BURKHALTER,**<br><br>**Defendants,**<br><br>**and**<br><br>**JACQUELINE BURKHALTER, THE BURKHALTER RANCH, DRIVE PROPERTIES, LLC, TBR SUPPLY HOUSE, INC., and DRIVE GULFPORT PROPERTIES,**<br><br>**Relief Defendants.** | Civil Action No. <u>1:24-cv-03583-VMC</u> |

## ORDER APPOINTING RECEIVER

**WHEREAS** this matter has come before this Court upon Plaintiff Securities and Exchange Commission's unopposed motion to appoint a receiver in the above-captioned action; and,

**WHEREAS** the Court finds that, based on the record in these proceedings, the appointment of a receiver in this action is necessary and appropriate for the purposes of marshaling and preserving all assets of Defendant Drive Planning,

LLC ("Receivership Assets") and the assets of Defendant Burkhalter and the Relief

Defendants that: (a) are attributable to funds derived from investors or clients of the

Defendants; (b) are held in constructive trust for the Defendants; and/or (c) may

otherwise be includable as assets of the estates of the Defendants (collectively, the

"Recoverable Assets"); and,

WHEREAS this Court has subject matter jurisdiction over this action and

personal jurisdiction over the Defendants and Relief Defendants, and venue

properly lies in this district.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED THAT:**

1.       This Court hereby takes exclusive jurisdiction and possession of the

assets, of whatever kind and wherever situated, of the following Defendant:

Drive Planning, LLC (the "Receivership Defendant").

2.       Until further Order of this Court, Kenneth Murena, Esq. is hereby

appointed to serve without bond as receiver (the "Receiver") for the estate of the

Receivership Defendant.

3.       Except as otherwise specified herein, all Receivership Assets and

Recoverable Assets are frozen until further order of this Court.  Accordingly, all

persons and entities with direct or indirect control over any Receivership Assets

and/or any Recoverable Assets, other than the Receiver, are hereby restrained and

enjoined from directly or indirectly transferring, setting off, receiving, changing,

selling, pledging, assigning, liquidating or otherwise disposing of or withdrawing such assets. This freeze shall include, but not be limited to, Receivership Assets and/or Recoverable Assets that are on deposit with financial institutions such as banks, brokerage firms and mutual funds.

## II.(underline)General Powers and Duties of Receiver(underline)

4.      The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Defendant under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Federal Rule of Civil Procedure 66.

5.      The trustees, directors, officers, managers, employees, investment advisors, accountants, attorneys and other agents of the Receivership Defendant are hereby dismissed and the powers of any general partners, directors and/or managers are hereby suspended. Such persons and entities shall have no authority with respect to the Receivership Defendant's operations or assets, except to the extent as may hereafter be expressly granted by the Receiver. The Receiver shall assume and control the operation of the Receivership Defendant and shall pursue and preserve all of their claims.

6.      No person holding or claiming any position of any sort with any of the

Receivership Defendant shall possess any authority to act by or on behalf of any of

the Receivership Defendant.

7.      Subject to the specific provisions in Sections III through XIV, below,

the Receiver shall have the following general powers and duties:

A.      To use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Defendant, including, but not limited to, monies, funds, securities, credits, effects, goods, chattels, lands, premises, leases, claims, rights and other assets, together with all rents, profits, dividends, interest or other income attributable thereto, of whatever kind, which the Receivership Defendant owns, possesses, has a beneficial interest in, or controls directly or indirectly ("Receivership Property" or, collectively, the "Receivership Estate");

B.      To take custody, control and possession of all Receivership Property and records relevant thereto from the Receivership Defendant; to sue for and collect, recover, receive and take into possession from third parties all Receivership Property and records relevant thereto;

C.      To manage, control, operate and maintain the Receivership Estate and hold in his possession, custody and control all Receivership Property, pending further Order of this Court;

D.      To use Receivership Property for the benefit of the Receivership Estate, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

E.      To take any action which, prior to the entry of this Order, could have been taken by the officers, directors, partners, managers,

trustees and agents of the Receivership Defendant;

F.   To engage and employ persons in his discretion to assist him in carrying out his duties and responsibilities hereunder, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

G.   To take such action as necessary and appropriate for the preservation of Receivership Property or to prevent the dissipation or concealment of Receivership Property;

H.   The Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

I.   To bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging his duties as Receiver;

J.   To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Estate; and,

K.   To take such other action as may be approved by this Court.

### III.  Access to Information

8.      The Receivership Defendant and the past and/or present officers, directors, agents, managers, general and limited partners, trustees, accountants and employees of the Receivership Defendant, as well as those acting in their place, are hereby ordered and directed to preserve and turn over or provide access to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Defendant and/or all Receivership Property; such information shall include but not be limited to books, records, documents, accounts and all other

instruments and papers.

9.     Within ten (10) days of the entry of this Order, the Receivership

Defendant shall file with the Court and serve upon the Receiver and the

Commission a sworn statement, listing: (a) the identity, location and estimated

value of all Receivership Property; (b) all employees (and job titles thereof), other

personnel, attorneys, accountants and any other agents or contractors of the

Receivership Defendant; and, (c) the names, addresses and amounts of claims of

all known creditors of the Receivership Defendant, except to the extent this

information was previously provided to the Commission.

10.    Within ninety (90) days of the entry of this Order, or at a date set

by the Court, the Receiver shall file with the Court and serve upon the parties a

sworn statement and accounting, with complete documentation, covering the

period from January 1, 2019 to the present:

> A.     Of all Receivership Property, wherever located, held by or in
> the name of the Receivership Defendant, or in which it,
> directly or indirectly, has or had any beneficial interest, or
> over which it maintained or maintains and/or exercised or
> exercises control, including, but not limited to: (a) all
> securities, investments, funds, real estate, automobiles, jewelry
> and other assets, stating the location of each; and (b) any and
> all accounts, including all funds held in such accounts, with
> any bank, brokerage or other financial institution held by,

in the name of, or for the benefit of any of them, directly or indirectly, or over which it maintained or maintains and/or exercised or exercises any direct or indirect control, or in which it had or has a direct or indirect beneficial interest, including the account statements from each bank, brokerage or other financial institution;

B.  Identifying every account at every bank, brokerage or other financial institution: (a) over which Receivership Defendant has signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, the Receivership Defendant;

C.  Identifying all credit, bank, charge, debit or other deferred payment card issued to or used by the Receivership Defendant, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and/or with authority to use a card, the balance of each account and/or card as of the most recent billing statement, and all statements for the last twelve months;

D.  Of all assets received by the Receivership Defendant from any person or entity, including the value, location, and disposition of any assets so received;

E.  Of all funds received by the Receivership Defendant, in any way related, directly or indirectly, to the conduct alleged in the Commission's Complaint. The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds;

G.  Of all expenditures exceeding $1,000 made by the Receivership Defendant, including those made on their behalf by any person or entity; and

H.  Of all transfers of assets made by the Receivership Defendant.

11.  Within thirty (30) days of the entry of this Order, the Receivership

Defendant shall provide to the Receiver and the Commission copies of the

Receivership Defendant's federal income tax returns for 2015-2023 with all

relevant and necessary underlying documentation.

12.     The Receivership Defendant and the Receivership Defendant's past

and/or present officers, directors, agents, managers, shareholders, employees,

accountants, debtors, creditors, managers and general and limited partners, and

other appropriate persons or entities shall answer under oath to the Receiver all

questions which the Receiver may put to them and produce all documents as

required by the Receiver regarding the business of the Receivership Defendant, or

any other matter relevant to the operation or administration of the receivership or

the collection of funds due to the Receivership Defendant. In the event that the

Receiver deems it necessary to require the appearance of the aforementioned

persons or entities, the Receiver shall make its discovery requests in accordance

with the Federal Rules of Civil Procedure.  Nothing in this paragraph, however,

shall preclude a witness, including Defendant Burkhalter, from asserting his or

her Fifth Amendment right against self-incrimination or from claiming any other

legal privilege against providing such information.

13.     The Receiver shall have the authority to issue subpoenas to compel

testimony of persons or production of records, consistent with the Federal Rules

of Civil Procedure and applicable Local Rules, except for the provisions of

Federal Rule of Civil Procedure 26(d)(1), concerning any subject matter within

the powers and duties granted by this Order.

14.     The Receivership Defendant is required to assist the Receiver in

fulfilling his duties and obligations.  As such, it must respond promptly and

truthfully to all requests for information and documents from the Receiver.  Nothing

in this paragraph, however, shall preclude a witness, including Defendant Burkhalter,

from asserting his or her Fifth Amendment right against self-incrimination or from

claiming any other legal privilege against providing such information.

## IV.  Access to Books, Records and Accounts

15.     The Receiver is authorized to take immediate possession of all assets,

bank accounts or other financial accounts, books and records and all other

documents or instruments relating to the Receivership Defendant.  All persons and

entities having control, custody or possession of any Receivership Property are

hereby directed to turn such property over to the Receiver.

16.     The Receivership Defendant, as well as its agents, servants,

employees, any persons acting for or on behalf of the Receivership Defendant,

and any persons receiving notice of this Order by personal service, facsimile

transmission or otherwise, having possession of the property, business, books,

records, accounts or assets of the Receivership Defendant are hereby directed to

deliver the same to the Receiver, his agents and/or employees.

17.     All banks, brokerage firms, financial institutions, and other persons or

entities which have possession, custody or control of any assets or funds held by,

in the name of, or for the benefit of, directly or indirectly, and of the Receivership

Defendant that receive actual notice of this Order by personal service, facsimile

transmission or otherwise shall:

> A.   Not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Defendant except upon instructions from the Receiver;
>
> B.   Not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court;
>
> C.   Within five (5) business days of receipt of that notice, file with the Court and serve on the Receiver, counsel for the Commission, and Defendants a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and,
>
> D.   Cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

## V.  Access to Real and Personal Property

18.    The Receiver is authorized to take immediate possession of all

personal property of the Receivership Defendant, wherever located, including but

not limited to electronically stored information, computers, laptops, hard drives,

external storage drives, and any other such memory, media or electronic storage

devices, books, papers, data processing records, evidence of indebtedness, bank

records and accounts, savings records and accounts, brokerage records and

accounts, certificates of deposit, stocks, bonds, debentures, and other securities and

investments, contracts, mortgages, furniture, office supplies and equipment.

19      The Receiver is authorized to take immediate possession of all real

property of the Receivership Defendant, wherever located, including but not

limited to all ownership and leasehold interests and fixtures. Upon receiving actual

notice of this Order by personal service, facsimile transmission or otherwise, all

persons other than law enforcement officials acting within the course and scope of

their official duties, are (without the express written permission of the Receiver)

prohibited from: (a) entering such premises; (b) removing anything from such

premises; or, (c) destroying, concealing or erasing anything on such premises.

20.      In order to execute the express and implied terms of this Order, the

Receiver is authorized to change door locks to the premises described above. The

Receiver shall have exclusive control of the keys. The Receivership Defendant, or

any other person acting or purporting to act on its behalf, is ordered not to change the

locks in any manner, nor to have duplicate keys made, nor shall they have keys in

their possession during the term of the receivership.

21.      The Receiver is authorized to open all mail directed to or received by

or at the offices or post office boxes of the Receivership Defendant, and to inspect all

mail opened prior to the entry of this Order, to determine whether items or

information therein fall within the mandates of this Order.

22.      Upon the request of the Receiver, the United States Marshal Service, in

any judicial district, is hereby ordered to assist the Receiver in carrying out his duties

to take possession, custody and control of, or identify the location of, any assets, records or other materials belonging to the Receivership Estate.

## VI. **Notice to Third Parties**

23.     The Receiver shall promptly give notice of his or her appointment to all known officers, directors, agents, employees, shareholders, creditors, debtors, managers and general and limited partners of the Receivership Defendant, as the Receiver deems necessary or advisable to effectuate the operation of the receivership.

24.     All persons and entities owing any obligation, debt, or distribution with respect to an ownership interest to any Receivership Defendant shall, until further ordered by this Court, pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the Receivership Defendant had received such payment.

25.     In furtherance of his or her responsibilities in this matter, the Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate.  All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the SEC.

26.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business,

operations or activities of the Receivership Defendant (the "Receiver's Mail"),

including all mail addressed to, or for the benefit of, the Receivership Defendant.

The Postmaster shall not comply with, and shall immediately report to the Receiver,

any change of address or other instruction given by anyone other than the Receiver

concerning the Receiver's Mail. The Receivership Defendant shall not open any of

the Receiver's Mail and shall immediately turn over such mail, regardless of when

received, to the Receiver. All personal mail of any individual Defendant, and/or any

mail appearing to contain privileged information belonging to any of the

Receivership Defendant's officers, directors, agents, managers, shareholders,

employees, managers and general and limited partners, and/or any mail not falling

within the mandate of the Receiver, shall be released to the named addressee by the

Receiver. The foregoing instructions shall apply to any proprietor, whether

individual or entity, of any private mail box, depository, business or service, or mail

courier or delivery service, hired, rented or used by the Receivership Defendant. The

Receivership Defendant shall not open a new mailbox, or take any steps or make any

arrangements to receive mail in contravention of this Order, whether through the

U.S. mail, a private mail depository or courier service.

27.    Subject to payment for services provided, any entity furnishing water,

electric, telephone, sewage, garbage or trash removal services to the Receivership

Defendant shall maintain such service and transfer any such accounts to the Receiver

unless instructed to the contrary by the Receiver.

28.     The Receiver is authorized to assert, prosecute and/or negotiate any

claim under any insurance policy held by or issued on behalf of the Receivership

Defendant, or its officers, directors, agents, employees or trustees, and to take any

and all appropriate steps in connection with such policies.

### VII.  Injunction Against Interference with Receiver

29.     The Receivership Defendant and all persons receiving notice of this

Order by personal service, facsimile or otherwise, are hereby restrained and enjoined

from directly or indirectly taking any action or causing any action to be taken,

without the express written agreement of the Receiver, which would:

A.     Interfere with the Receiver's efforts to take control,
possession, or management of any Receivership Property;
such prohibited actions include but are not limited to, using
self-help or executing or issuing or causing the execution or
issuance of any court attachment, subpoena, replevin,
execution, or other process for the purpose of impounding
or taking possession of or interfering with or creating or
enforcing a lien upon any Receivership Property;

B.     Hinder, obstruct or otherwise interfere with the Receiver in
the performance of his duties; such prohibited actions
include but are not limited to, concealing, destroying or
altering records or information;

C.     Dissipate or otherwise diminish the value of any
Receivership Property; such prohibited actions include but
are not limited to, releasing claims or disposing,
transferring, exchanging, assigning or in any way
conveying any Receivership Property, enforcing
judgments, assessments or claims against any Receivership
Property or any Receivership Defendant, attempting to
modify, cancel, terminate, call, extinguish, revoke or
accelerate (the due date), of any lease, loan, mortgage,
indebtedness, security agreement or other agreement

executed by any Receivership Defendant or which
otherwise affects any Receivership Property; or,

D.   Interfere with or harass the Receiver, or interfere in any
manner with the exclusive jurisdiction of this Court over
the Receivership Estates.

30.   The Receivership Defendant shall cooperate with and assist the
Receiver in the performance of his duties.

31.   The Receiver shall promptly notify the Court and SEC counsel of any
failure or apparent failure of any person or entity to comply in any way with the
terms of this Order.

## VIII.  **Stay of Litigation**

32.   As set forth in detail below, the following proceedings, excluding the
instant proceeding and all police or regulatory actions and actions of the Commission
related to the above-captioned enforcement action, are stayed until further Order of
this Court:

All civil legal proceedings of any nature, including, but not limited to,
bankruptcy proceedings, arbitration proceedings, foreclosure actions, default
proceedings, or other actions of any nature involving: (a) the Receiver, in his
capacity as Receiver; (b) any Receivership Property, wherever located; (c)
the Receivership Defendant, including subsidiaries and partnerships; or, (d)
the Receivership Defendant's past or present officers, directors, managers,
agents, or general or limited partners sued for, or in connection with, any
action taken by them while acting in such capacity of any nature, whether as
plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise
(such proceedings are hereinafter referred to as "Ancillary Proceedings").

33.   The parties to any and all Ancillary Proceedings are enjoined from
commencing or continuing any such legal proceeding, or from taking any action, in

connection with any such proceeding, including, but not limited to, the issuance or employment of process.

34.     All Ancillary Proceedings are stayed in their entirety, and all Courts having any jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.    Further, as to a cause of action accrued or accruing in favor of the Receivership Defendant against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

## IX.  Managing Assets

35.     For the Receivership Estate, the Receiver shall establish one or more custodial accounts at a federally insured bank to receive and hold all cash equivalent Receivership Property (the "Receivership Funds").

36.     The Receiver's deposit account shall be entitled "Receiver's Account, Estate of Drive Planning, LLC," together with the name of the action.

37.     The Receiver may, without further Order of this Court, transfer, compromise, or otherwise dispose of any Receivership Property, other than real estate, in the ordinary course of business, on terms and in the manner the Receiver deems most beneficial to the Receivership Estate, and with due regard to the realization of the true and proper value of such Receivership Property.

38.     Subject to Paragraph 39, immediately below, the Receiver is authorized to locate, list for sale or lease, engage a broker for sale or lease, cause the

sale or lease, and take all necessary and reasonable actions to cause the sale or lease

of all real property in the Receivership Estate, either at public or private sale, on

terms and in the manner the Receiver deems most beneficial to the Receivership

Estate, and with due regard to the realization of the true and proper value of such real

property.

39.     Upon further Order of this Court, pursuant to such procedures as may

be required by this Court and additional authority such as 28 U.S.C. §§ 2001 and

2004, the Receiver will be authorized to sell, and transfer clear title to, all real

property in the Receivership Estate.

40.     The Receiver is authorized to take all actions to manage, maintain,

and/or wind-down business operations of the Receivership Estate, including

making legally required payments to creditors, employees, and agents of the

Receivership Estates and communicating with vendors, investors, governmental

and regulatory authorities, and others, as appropriate.

41.     The Receiver shall take all necessary steps to enable the Receivership

Funds to obtain and maintain the status of a taxable "Settlement Fund," within the

meaning of Section 468B of the Internal Revenue Code and of the regulations, when

applicable, whether proposed, temporary or final, or pronouncements thereunder,

including the filing of the elections and statements contemplated by those provisions.

The Receiver shall be designated the administrator of the Settlement Fund, pursuant

to Treas. Reg. § 1.468B-2(k)(3)(i), and shall satisfy the administrative requirements

imposed by Treas. Reg. § 1.468B-2, including but not limited to (a) obtaining a

taxpayer identification number, (b) timely filing applicable federal, state, and local

tax returns and paying taxes reported thereon, and (c) satisfying any information,

reporting or withholding requirements imposed on distributions from the Settlement

Fund. The Receiver shall cause the Settlement Fund to pay taxes in a manner

consistent with treatment of the Settlement Fund as a "Qualified Settlement Fund."

The Receivership Defendant shall cooperate with the Receiver in fulfilling the

Settlement Funds' obligations under Treas. Reg. § 1.468B-2.

## X.  **Investigate and Prosecute Claims**

42.     Subject to the requirement, in Section VII above, that leave of this

Court is required to resume or commence certain litigation, the Receiver is

authorized, empowered and directed to investigate, prosecute, defend, intervene in or

otherwise participate in, compromise, and/or adjust actions in any state, federal or

foreign court or proceeding of any kind as may in his discretion, and in consultation

with SEC counsel, be advisable or proper to recover and/or conserve Receivership

Property.

43.     Subject to his or her obligation to expend receivership funds in a

reasonable and cost-effective manner, the Receiver is authorized, empowered and

directed to investigate the manner in which the financial and business affairs of

the Receivership Defendant were conducted and (after obtaining leave of this

Court) to institute such actions and legal proceedings, for the benefit and on behalf

of the Receivership Estate, as the Receiver deems necessary and appropriate; the Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, and such other relief from this Court as may be necessary to enforce this Order. Where appropriate, the Receiver should provide prior notice to Counsel for the Commission before commencing investigations and/or actions.

44.     The Receiver may file a motion with the Court to waive all privileges, including the attorney-client privilege, held by the Receivership Defendant.  The Receiver must confer with counsel for Defendant Burkhalter before filing any such motion and explain the reason(s) for seeking the waiver.  If the Receiver and Defendant Burkhalter are unable to reach an agreement, the Receiver may file his or her motion and Defendant Burkhalter shall have the opportunity to respond to any such motion.

45.     The Receiver has a continuing duty to ensure that there are no conflicts of interest between the Receiver, his or her Retained Personnel (as that term is defined below), and the Receivership Estate.

## XI.  Bankruptcy Filing

46.     The Receiver may seek authorization of this Court to file voluntary petitions for relief under Title 11 of the United States Code (the "Bankruptcy Code") for the Receivership Defendant. If a Receivership Defendant is placed in bankruptcy

proceedings, the Receiver may become, and may be empowered to operate each of the Receivership Estates as, a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity, except that the Receiver shall not be empowered to waive all privileges, including the attorney client privilege, unless granted permission to do so by the Court. Pursuant to Paragraph 4 above, the Receiver is vested with management authority for all entity Receivership Defendant and may therefore file and manage a Chapter 11 petition.

47.     The provisions of Section VIII above bar any person or entity, other than the Receiver, from placing any of the Receivership Defendant in bankruptcy proceedings.

## XII.  Liability of Receiver

48.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary obligations in this matter.

49.     The Receiver and his/her agents, acting within scope of such agency ("Retained Personnel") are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel nor shall the Receiver

or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

50.     This Court shall retain jurisdiction over any action filed against the Receiver or Retained Personnel based upon acts or omissions committed in their representative capacities.

51.     In the event the Receiver decides to resign, the Receiver shall first give written notice to the Commission's counsel of record and the Court of its intention, and the resignation shall not be effective until the Court appoints a  successor. The Receiver shall then follow such instructions as the Court may provide.

## XIII.  Recommendations and Reports

52.     The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and liquidation of all remaining, recovered, and recoverable Receivership Property (the "Liquidation Plan").

53.     Within ninety (90) days of the entry date of this Order, the Receiver shall file the Liquidation Plan in the above-captioned action, with service copies to counsel of record.

54.     Within thirty (30) days after the end of each calendar quarter, the Receiver shall file with the Court and serve on the parties a full report and accounting of each Receivership Estate (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the

existence, value, and location of all Receivership Property, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership Estates.

55.     The Quarterly Status Report shall contain the following:

A.      A summary of the operations of the Receiver;

B.      The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C.      A schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D.      A description of all known Receivership Property, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

E.      A description of liquidated and unliquidated claims held by the Receivership Estate, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

F.      A list of all known creditors with their addresses and the amounts of their claims;

G.      The status of Creditor Claims Proceedings, after such proceedings have been commenced; and,

H.      The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations.

56.     On the request of the Commission, the Receiver shall provide the Commission with any documentation that the Commission deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's mission.

## XIV.  Fees, Expenses and Accountings

57.     Subject to Paragraphs 58– 64 immediately below, the Receiver need not obtain Court approval prior to the disbursement of Receivership Funds for expenses in the ordinary course of the administration and operation of the receivership.  Further, prior Court approval is not required for payments of applicable federal, state or local taxes.

58.     Subject to Paragraph 59 immediately below, the Receiver is authorized to solicit persons and entities ("Retained Personnel") to assist him in carrying out the duties and responsibilities described in this Order.  The Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.

59.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Estates as described in the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions") agreed to by the Receiver.  Such compensation shall require the prior approval of the Court.

60.     Within forty-five (45) days after the end of each calendar quarter, the

Receiver and Retained Personnel shall apply to the Court for compensation and

expense reimbursement from the Receivership Estates (the "Quarterly Fee

Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application

with the Court, the Receiver will serve upon counsel for the SEC a complete copy of

the proposed Application, together with all exhibits and relevant billing information in a

format to be provided by SEC staff.

61.     All Quarterly Fee Applications will be interim and will be subject to

cost benefit and final reviews at the close of the receivership.  At the close of the

receivership, the Receiver will file a final fee application, describing in detail the

costs and benefits associated with all litigation and other actions pursued by the

Receiver during the course of the receivership.

62.     Quarterly Fee Applications may be subject to a holdback in the

amount of 20% of the amount of fees and expenses for each application filed with

the Court. The total amounts held back during the course of the receivership will

be paid out at the discretion of the Court as part of the final fee application

submitted at the close of the receivership.

63.     Each Quarterly Fee Application shall:

A.      Comply with the terms of the Billing Instructions agreed to by the
        Receiver; and,

B.      Contain representations (in addition to the Certification
        required by the Billing Instructions) that: (i) the fees and
        expenses included therein were incurred in the best interests of

> the Receivership Estate; and, (ii) with the exception of the
> Billing Instructions, the Receiver has not entered into any
> agreement, written or oral, express or implied, with any person
> or entity concerning the amount of compensation paid or to be
> paid from the Receivership Estate, or any sharing thereof.

64.     At the close of the Receivership, the Receiver shall submit a Final

Accounting, in a format to be provided by SEC staff, as well as the Receiver's final

application for compensation and expense reimbursement.

**IT IS SO ORDERED**, this  13th  day of  August         , 2024, at Atlanta,

**Georgia.**

**VICTORIA MARIE CALVERT**
**UNITED STATES DISTRICT JUDGE**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## (ATLANTA DIVISION)

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. _____** |
| **DRIVE PLANNING, LLC, and RUSSELL TODD BURKHALTER,** | **JURY TRIAL DEMANDED** |
| **Defendants,** | |
| **and** | |
| **JACQUELINE BURKHALTER, THE BURKHALTER RANCH CORPORATION, DRIVE PROPERTIES, LLC, DRIVE GULFPORT PROPERTIES LLC, and TBR SUPPLY HOUSE, INC.,** | |
| **Relief Defendants.** | |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC"), alleges the following:

### I.      OVERVIEW

1.      From 2020 through at least June 2024, Defendant Russell Todd

Burkhalter ("Burkhalter") ran a Ponzi scheme through his business, Drive Planning,

LLC ("Drive Planning"), selling unregistered securities in the form of "Real Estate

Acceleration Loans" ("REAL"), which Burkhalter described in promotional materials

as a "bridge loan opportunity promising 10% in 3 months."  As of the end of June

2024, over 2,000 investors had invested more than $300,000,000 in REAL.

2.      Defendants encouraged people to tap their savings, their IRAs, and even

lines of credit, to invest in REAL.  As of early May 2024, the scheme was receiving

applications for over a million dollars every day, driven by an organization of more

than 100 sales agents.

3.      Defendants and the sales agents they trained falsely told REAL

investors that Drive Planning pooled REAL investments and loaned that money out

2

to property developers and/or used it to enter into joint ventures with property developers, thereby earning the profits necessary to pay returns to REAL investors.

4.      In fact, Drive Planning did not have any legitimate profitable enterprise capable of generating the sums necessary to pay the promised 10 percent returns every three months.  Instead, in classic Ponzi fashion, Burkhalter used money from new investors to pay the supposed "returns" to existing investors and to maintain a luxurious lifestyle.

5.      Emergency relief is necessary.  While Burkhalter pledged, on June 10, 2024, to cease accepting new investments in REAL, and to cease paying commissions or paying supposed returns to investors, he nevertheless paid sales commissions to Drive Planning sales agents on June 21, 2024.  Moreover, Burkhalter remains a signatory on bank accounts containing millions of dollars of investor funds and has recently entered into a divorce settlement pursuant to which he may transfer to his spouse property bought with investor funds.  There is a serious risk of dissipation of assets that could, if preserved, help fund investor redress.

6.      Given the scope and duration of this Ponzi scheme, an asset freeze and a receiver are necessary to gather, preserve and protect whatever assets still exist for the benefit of the victims of the Defendants' Ponzi scheme.

## II.   VIOLATIONS

7.     The Defendants have (1) employed devices, schemes, and artifices to defraud investors in the offer and sale of securities, (2) obtained money by means of material misrepresentations and omissions, and (3) engaged in acts practices and courses of business which operate as a fraud, all in violation of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

8.     The Defendants have (1) employed devices, schemes, and artifices to defraud investors in connection with the purchase and sale of securities, (2) made material misrepresentations and misleading omissions, and (3) engaged in acts, practices, and courses of business which operate as a fraud, all in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

9.     Defendant Burkhalter is also liable as a control person of Drive Planning under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for its violations of Exchange Act Section 10(b) and Rules 10b-5(a), (b), and (c).

## III.   JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging

in the transactions, acts, practices, and courses of business alleged in this complaint,

and transactions, acts, practices, and courses of business of similar purport and

object, for disgorgement plus prejudgment interest, for civil penalties, for an officer

and director bar against Burkhalter, and for other equitable relief.

11.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act

[15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

12.     Defendants, directly and indirectly, made use of the mails, and the

means and instrumentalities of interstate commerce in connection with the

transactions, acts, practices, and courses of business alleged in this complaint.

13.     Certain of the transactions, acts, practices, and courses of business

constituting violations of the Securities Act and the Exchange Act occurred in the

Northern District of Georgia.  In addition, Defendant Burkhalter resides (at least part-

time) in this judicial district, Defendant Drive Planning maintains its principal place

of business in this judicial district, and certain REAL investors reside in this judicial

district.

14.     Defendants, unless restrained and enjoined by this Court, will continue

to engage in the transactions, acts, practices, and courses of business alleged in this

complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## IV.  THE DEFENDANTS

15.    **Russell Todd Burkhalter**, age 52, is a resident of St. Petersburg, Florida.  Burkhalter is the sole owner of Drive Planning which he alone controls and which he operates from offices in Alpharetta, Georgia.  He formerly held a Series 65 securities license and has been licensed in Georgia as a resident insurance agent since 1997.

16.    **Drive Planning, LLC** is a Georgia limited liability company. Burkhalter formed Drive Planning in 2015, listing himself as organizer and registered agent, and listing offices in Johns Creek (Fulton County), Georgia.  At all times relevant to this case, Burkhalter had actual control over Drive Planning's assets and operations, and ultimate control over the use and disposition of investor funds.  In short, Drive Planning is the alter ego of Burkhalter.  The most recent annual registration lists offices at 8000 Avalon Boulevard in Alpharetta, Georgia.

## V.    RELIEF DEFENDANTS

17.    **Jacqueline Burkhalter** is a resident of Blue Ridge, Fannin County, Georgia, in this judicial district.  She was Burkhalter's wife while Burkhalter operated his Ponzi scheme.

6

18.    **The Burkhalter Ranch Corporation** ("Burkhalter Ranch") is a
Georgia corporation incorporated on August 21, 2021. Burkhalter Ranch has its
principal office in Mineral Bluff, Georgia, in this judicial district. Defendant
Burkhalter is the Chief Executive Officer and Relief Defendant Jacqueline
Burkhalter is listed as its Chief Financial Officer and Corporate Secretary.

19.    **Drive Properties, LLC** ("Drive Properties") is a Georgia limited
liability company formed on January 8, 2019, with its principal place of business in
Alpharetta, Georgia, in the same office as Defendant Drive Planning. Relief
Defendant Jacqueline Burkhalter is the registered agent for service of process and
listed as the company's Organizer.

20.    **TBR Supply House, Inc.** ("TBR") is a Georgia corporation formed
on January 17, 2022, with its principal place of business in Mineral Bluff, Georgia.
Relief Defendant Jacqueline Burkhalter is the registered agent for service of
process and listed as the company's CEO, CFO, and Corporate Secretary.

21.    **Drive Gulfport Properties, LLC** ("Drive Gulfport") is a Florida
limited liability company formed on December 9, 2019, with its principal place of
business in St. Petersburg, Florida. Relief Defendant Jacqueline Burkhalter is the
registered agent for service of process and listed as the company's Manager.

## VI.  FACTS

### The Ponzi Scheme Begins

22.     In 2020, Burkhalter began offering to the public what he described in promotional materials as a "bridge loan opportunity promising 10% in 3 months." Burkhalter named the investment vehicle "REAL" (an acronym for "Real Estate Acceleration Loan").

23.     Defendants produced and gave to potential investors promotional materials, including a large-font three-page color brochure (the "REAL brochure") that described REAL in four bullet points:

- 3-month term;

- 10% return;

- Quitclaim deed collateral; and

- $20,000 minimum.

24.     Investments in REAL were and are "securities," as defined by federal securities law.

25.     Defendants offered the REAL investments for sale nationwide and accepted investments from international investors.

26.     Defendants distributed the REAL brochure to prospective investors through the U.S. mail, by emailing it as a Portable Document Format (PDF), by

reproducing it on the Drive Planning website (www.driveplanning.com), by handing it directly to prospective investors during in-person sales presentations, and by making hard copies available to Drive Planning's sales agents.

27.     Another bulleted list on the REAL brochure represented:

- If you have $20,000 you can participate;

- You can use money from your retirement account;

- You don't have to be an accredited investor;

- You can use money from savings;

- You can use money from a line of credit; and

- You do not need to be a U.S. citizen.

28.     Burkhalter and the sales agents he recruited to sell REAL represented to prospective investors that Drive Planning would pool their money and loan it out to property developers, and/or enter into joint ventures with property developers, and thereby generate the profit necessary to meet obligations to REAL investors.

29.     But the interest from property developers in doing business with Drive Planning proved insufficient, and Drive Planning had no other profit-generating enterprises sufficient to meet obligations to REAL investors, each of whom expected a ten percent return every 90 days.

9

***A Scheme to Defraud from Day One***

30.     Analysis of Drive Planning bank records indicates that the first investment in REAL occurred on September 22, 2020.

31.     On that date, Drive Planning received and deposited a check for $50,000 from the first REAL investor into a Drive Planning bank account at Truist Bank, which had a beginning balance of $90,665.  From September 22, 2020, to October 13, 2020, the account only received one additional deposit in the amount of $6.

32.     On October 13, 2020, Drive Planning transferred $112,000 out of that account to a self-directed IRA.  Of this total, $90,671 in funds (the beginning Truist balance and the $6 deposit) were unrelated to REAL investments.  This means that the self-directed IRA transfer included at least $21,329 of REAL investment funds.

33.     The self-directed IRA that received the $112,000 transfer, including funds from the first REAL investor, was for the benefit of an individual who had invested in a previous "energy" investment offered by Drive Planning.  The terms of that investment called for principal and fixed return to be paid in October 2020.

34.     The following chart shows the above-described flow of money:

| Drive Planning Truist Account xx2951 | | | | | |
| Summary of First Investment Use | | | | | |
| From September 22, 2020 to October 13, 2020 | | | | | |
| First REAL Investment 9/22/20 | $ | 50,000 | | | |
| Total Investor Deposits | | 50,000 | Payment to Self-Directed IRA | $ | 112,000 |
| | | | Less: Other Deposits | | (90,671) |
| Beginning Balance | | 90,665 | REAL Investment Funds Used | $ | 21,329 |
| Other Deposits | | 6 | | | |
| Total Other Deposits | $ | 90,671 | | | |

35.     Likewise, Burkhalter used funds from the second and third investors in REAL for his personal benefit and not for bridge loans to property developers or joint ventures with property developers.

36.     The second investor in REAL wired $30,000 into the Drive Planning bank account at Truist on October 14, 2020.  The third investor wired in $150,000 on the same day.  At the time, the balance of the account was $11,689.  From October 14 to November 16, 2020, the account received $1,500 in additional deposits.

37.     On October 19, 2020, Burkhalter paid $40,000 to Atlantic RV Centers LLC.

38.     From October 14 to November 16, 2020, Burkhalter spent another $11,029 from the Drive Planning Truist bank account for additional RV-related expenses.

39.     Then, on November 16, 2020, Burkhalter sent a wire out of the Drive Planning Truist bank account for $42,518 to the law firm of Kessler & Solomiany, LLC.

40.     Kessler & Solomiany represented Burkhalter's ex-wife.

41.     The following chart shows the above-described flow of money from the second and third REAL investors and shows that Burkhalter used $80,358 from those investors for personal expenses, and not for bridge loans to property developers or joint ventures with property developers:

| Drive Planning Truist Account xx2951 | | | | |
|---|---|---|---|---|
| From October 14, 2020 to November 16, 2020 | | | | |
| Second REAL Investment | $ | 30,000 | Atlantic RV Centers LLC | $ 40,000 |
| Third REAL Investment | | 150,000 | Other RV Expenses | 11,029 |
| Total Investor Deposits | | 180,000 | Kessler & Solomiany LLC ▉▉▉ | 42,518 |
| | | | Non-Real Estate Expenses | 93,547 |
| | | | | |
| Beginning Balance | | 11,689 | Non-Real Estate Expenses | 93,547 |
| Other Deposits | | 1,500 | Less: Other Deposits | (13,189) |
| Total Other Deposits | $ | 13,189 | REAL Investment Funds Used | $ 80,358 |

***Expanding the Scheme with Sales Agents and Sales Incentives***

42.     Beyond the REAL brochure and other website content, Defendants increased the inflow of cash from REAL investors by recruiting and paying sales agents, identified as "financial consultants" on the Drive Planning website.

43.     Defendants paid sales agents a four percent commission on each REAL investment he or she sold, including on amounts that investors chose to "rollover" into a new 90-day investment.

44.     Defendants conducted frequent training seminars for Drive Planning sales agents but did not directly disclose to all agents that Drive Planning did not have a profit generating enterprise sufficient to meet obligations to REAL investors and sales agents.

45.     Defendants further motivated sales agents by creating two clubs for top sales performers: The Presidents Club and the Chairman's Council.  Entry into the clubs required selling a certain amount of Drive Planning products, including REAL.

46.     Sales of $2,500,000 entitled the sales agent to membership in the President's Club.

47.     Sales of $4,500,000 entitled the sales agent to membership in the Chairman's Council.

48.     Membership in each group entitled the sales agent to an all-expense-paid trip for two to destinations including Toronto, Cabo San Lucas, and the Greek Isles.

49.     Defendants' sales plan worked.  Drive Planning's master spreadsheet ("Spreadsheet"), on which it tracked investments, withdrawals, and other information, shows that, through May 6, 2024, Defendants raised more than $336 million from more than 2,000 investors in at least 48 U.S. states, as well as other countries, with $66.9 million of that amount coming from retirement accounts.

50.     The above-referenced Spreadsheet was the only tool by which Drive Planning kept track of REAL investments.  Drive Planning did not use accounting software, nor did it keep typical financial or accounting records.

51.     According to the Spreadsheet, Drive Planning paid $131 million of purported returns to investors.  Based on the Spreadsheet, Drive Planning owes REAL investors $287,000,000, as of May 6, 2024.  The available bank records approximately match these values, showing Defendants raised $372 million from investors and repaid investors $154.9 million from September 2020 through June 2024.

52.     Bank records show that Drive Planning transferred $65 million to Automatic Data Processing, Inc. ("ADP"), Drive Planning's payroll processor.

53.     While Drive Planning did have a few W2 employees whose salaries may be included in that figure, the vast majority of that amount was commission payments to sales agents.

54.     Because Drive Planning received only $17.6 million from sources

14

other than REAL investors, at least $47.4 million of the above-mentioned $65 million in transfers to ADP must have been sourced from investor funds.

55.     For one recent two-week period, Drive Planning paid sales commissions of $1.92 million.

### *Preserving Capital for the Scheme Through Rollovers*

56.     Drive Planning furthered the scam by prompting investors to rollover their REAL investments, including the supposed 10 percent return, at the end of the three-month term.

57.     Drive Planning did so by sending an email to investors at about day 60 of the 90-day term, asking whether investors wanted to make a withdrawal, rollover the supposed balance into a new 90-day investment, or add additional funds to the rollover investment.

58.     In connection with solicitation of an election to withdraw or roll over the investment, Drive Planning never disclosed that any withdrawal would necessarily be sourced by, not a profit, but the principal invested by a later REAL investor, nor that any interest credited was a phantom number and not the product of profitable use of the investors' funds.

59.     Drive Planning received $8.8 million in REAL investments in 2021,
$63.2 million in 2022, $163.1 million in 2023, and $100.3 million in 2024 (through
early May 2024).

### *No Viable Engine for Generating the Supposed 10 Percent Return*

60.     Bank records reveal that, contrary to what it represented to investors
and prospective investors, Drive Planning was not deploying the cash from REAL
investments into bridge loans to developers or joint ventures with developers.

61.     Unbeknownst to investors, Drive Planning did not receive substantial
income from loans to or joint ventures with property developers.  Rather, Drive
Planning's revenue sources were limited to commissions earned on life insurance
sales, membership fees (ranging from $2,000 to $5,000) from clients who received
financial planning services, and rental income from a few properties.

62.     From September 1, 2020, to June 2024, Drive Planning's main
accounts received deposits of $389.6 million.  Of these deposits, at least $372
million (95.4%) were received from investors in the REAL program.  During this
same period, Drive Planning only received funds totaling $17.6 million from other
sources, with $4 million of that from other investment programs Drive Planning
was running.

### *Ponzi Payments*

63.     Based on the bank records, from September 1, 2020, to June 2024,

investors received "returns" of $154.9 million.  With $372 million of REAL investor funds but only $17.6 million of potential non-REAL investor funds available, at least approximately $137.2 million of the "returns" were Ponzi payments, sourced from investor funds.

| Summary | | | | | |
|---|---|---|---|---|---|
| **Deposits** | | | **Ponzi Analysis** | | |
| Total Deposits | $ | 389,665,393 | Non-Investor Deposits | $ | 17,642,625 |
| Less: Investor Deposits | | (372,022,769) | Less: Investor Repayments | | (154,918,462) |
| Non-Investor Deposits | $ | 17,642,625 | (Investor-Funded Repayments) | $ | (137,275,837) |

64.    Without new investor funds, Drive Planning would not have been able to meet its repayment obligations.  For example, in May of 2022, Drive Planning received investor deposits of $3.3 million and non-investor deposits of $41,311 yet paid out $518,874 to investors.

65.    In September of 2023, Drive Planning accounts received investor deposits of $16.8 million and non-investor deposits of $270,104 yet paid out $7.1 million to investors.

66.    Since September of 2021, Drive Planning does not appear to have been able to generate enough non-investor funds to repay investors.  Based on its purported collateral and historical cash flows, it does not appear that Drive Planning will be able to generate future revenue sufficient to pay its investors.

***Spending Other People's Money***

67.    In addition to misusing investor money for Ponzi payments, Burkhalter misappropriated millions of dollars of investor funds to acquire and

17

maintain a wealthy lifestyle.  Some examples of Burkhalter's misappropriation follow.

68.     On October 20, 2023, Drive Planning transferred $3.1 million from Drive Planning's JPMorgan account to MarineMax for the purchase of a yacht called "Stillwater".  At least $2 million of this payment came from investor funds.

69.     Purchase documents received from MarineMax show that Burkhalter purchased the yacht for himself.

70.     The MarineMax documents state that the yacht will be titled under Burkhalter's name and that, while Drive Planning would provide the payment, it "will hold no claim or interest" in the yacht, now renamed "Live More."

71.     Below is a listing photo for the yacht taken prior to Burkhalter's purchase.



72.     From September 2020 to June 2024, Drive Planning and Burkhalter spent additional large sums of investor funds on expenses that are not consistent with the real estate deals represented to investors in the REAL program.

73.     Because the funds to make these purchases came from Drive Planning accounts that primarily held investor funds, Defendants must have used investor funds to make these purchases.

74.     For example, Drive Planning and Burkhalter spent $319,628 on clothing, jewelry, and beauty treatments.  They spent $69,293 at Diamonds Direct, $75,785 at Louis Vuitton, and $7,777 at Drip IV, a beauty and wellness company located in St. Petersburg, Florida.

75.    Defendants also spent considerable funds on luxury travel and vacations, including least $4.6 million on chartering private jets and luxury car services, at least $183,871 on hotels and resorts (including $15,404 to Norwegian Cruise Line, $12,750 to Access Italy, an Italian travel company, and $8,738 to Expedia.com).

76.    Drive Planning and Burkhalter used $1.3 million to repay investors in Drive Planning's other investment programs.

77.    Defendants spent at least $749,243 on automobile related expenses, including at least $92,127 to a Jaguar Land Rover dealer, $243,414 to Crown Automotive in St. Petersburg, Florida, and another $67,006 to Carvana.

78.    From May 24, 2021, through December 2023, Drive Planning transferred $1.9 million to Coinbase.  Starting in April 2023, Drive Planning received $1.2 million back from Coinbase, for a net of $732,966 transferred to Coinbase.  Burkhalter also used investor funds to buy a ranch in Mineral Bluff (Fannin County), Georgia.

79.    On this property, Burkhalter used investor funds to build a large barn (the "Staurolite Barn") in Mineral Bluff, Georgia, which he rents out as an event venue.

80.    Burkhalter used investor funds to buy a clothing business in Blue Ridge, Georgia.  Relief Defendant TBR Supply House operates that business.

81.    Burkhalter used at least $2 million in investor funds to buy a luxury condo in Cabo San Lucas, Mexico.

82.    In March 2024, Burkhalter wired $1,145,000 of investor funds to NetJets, a private jet company.

83.    On information and belief, Burkhalter used or intends to use real estate purchased with investor funds to fund his obligations under a divorce settlement.

### Defendants' Misrepresentations and Omissions

84.    In addition to the above-described scheme to defraud, Defendants further defrauded investors through material misrepresentations and omissions made in connection with sales of REAL.

### *Investor A*

85.    For example, in 2022, Burkhalter and Drive Planning's Chief Operating Officer ("the COO"), spoke by phone to an investor in South Carolina ("Investor A"), soliciting him to invest in REAL.  During that call, Burkhalter and the COO represented that REAL would produce a guaranteed return of 10 percent for a three-month investment and that the investor's funds would be used to make bridge loans to property developers or to enter profitable joint ventures with property developers.

86.     In their conversations with Investor A, Burkhalter and the COO referred him to a list of properties that they claimed were owned by Drive Planning and would be collateral for his investment.

87.     Neither Burkhalter nor the COO disclosed that Investor A's investment would or could be used to make principal or interest payments to other investors.

88.     Neither Burkhalter nor the COO told Investor A that his money would or could be used to fund personal purchases by Drive Planning's principals.

89.     In reliance on the above representations and in ignorance of the above omissions, Investor A invested $45,000 in REAL in 2022.  Encouraged by what he thought were profits on that first investment, he invested another $100,000 in REAL in 2024.

### *Investor B*

90.     In 2021, an investor in Georgia ("Investor B") became a client of Drive Planning, purchasing life insurance and receiving financial advice.

91.     In a phone call in July 2021, Burkhalter solicited Investor B to invest in REAL, telling him that REAL was a profit-sharing deal in which Drive Planning would provide capital to a property developer, and that profits would be split with REAL investors and used to pay the returns on the REAL investment.  Burkhalter

guaranteed returns of 10 percent for a three-month investment and told Investor B that there was an option to rollover the investment up to three times.

92.    No one from Drive Planning told Investor B that his investment could or would be used to make principal or interest payments to other investors, to fund the personal expenses of Burkhalter, or that certain properties bought by Drive Planning with investor money were not owned by Drive Planning.

93.    In reliance on the above representations and in ignorance of the above omissions, Investor B invested $100,000 in REAL in July 2021 and rolled over the investment twice before withdrawing $133,000 in what he believed was principal and interest in April 2022.

94.    Reassured by what they believe to be "returns," Investor B and his spouse invested in REAL several more times, including on November 18, 2022 ($20,000), on April 12, 2023 ($50,000), on April 14, 2023 ($100,000), on June 21, 2023 ($280,000), on June 26, 2023 ($25,000), on January 4, 2024 ($20,000), and on January 15, 2024 ($30,000).  Some of the proceeds for the above additional investments came from Investor B's Roth IRA account and his children's 529 accounts.

*Company A*

95.    On or about March 28, 2023, Burkhalter and the COO visited the New Jersey offices of a financial and insurance consulting firm ("Company A").

23

96. During that visit, Burkhalter and the COO promoted the REAL program, telling the principal of Company A that REAL was designed to provide bridge loans for highly profitable real estate development deals.

97. Burkhalter and the COO represented that REAL participants would receive a ten percent rate of return every three months, and there was a choice to roll over the investment plus interest or withdraw it at the end of each three-month term.

98. Burkhalter and the COO also said that REAL investments were protected by Drive Planning's ownership of real property pledged as collateral.

99. Burkhalter and the COO did not disclose that REAL investments would or could be used to pay back principal or interest to earlier investors, nor that any supposed "return" could be funded by principal invested by later investors, rather than by profits from real estate deals, nor that REAL investments would or could be used to fund the personal expenses of Burkhalter and/or the COO.

100. In reliance on the above representations and ignorance of the above omissions, Company A invested $25,000 in REAL on or about February 16, 2021.

101. Company A rolled over the funds for five quarters before withdrawing $48,717.92.

102.    Reassured by the "return" received as promised, Company A began referring certain clients to Drive Planning for investment in REAL in exchange for commission payments to Company A of four percent for each new REAL investor.

103.    On June 4, 2024, Company A received notice from Drive Planning via email that it was halting new investments in REAL as of June 15.

104.    On June 5, 2024, the principal of Company A spoke to Burkhalter by phone and asked whether there was a potential regulatory issue with Drive Planning.

105.    Although he knew at the time that the SEC was investigating Drive Planning, Burkhalter responded that there was no regulatory issue, and that the halt in the REAL program was due to an internal audit.

### *Other Prospective REAL Investors*

106.    As they had in the above-cited specific instances, Defendants told other prospective REAL investors that Drive Planning generated the return for REAL investors through its business ventures with property developers.

107.    In fact, unbeknownst to investors, Defendants did not have a profit-generating enterprise sufficient to meet its obligations to REAL investors.

108.    As they had in the above-cited specific instances, Defendants told prospective investors in REAL that their investments were collateralized by real estate.

109.   In fact, REAL investors held no security interest in any real estate. Their investments were wholly unsecured.

110.   As they did in the above-cited specific examples, Defendants omitted to disclose to other prospective REAL investors that Drive Planning's revenue from other sources could not possibly meet obligations to REAL investors.

111.   As they did in the above-cited specific examples, Defendants omitted to disclose to other REAL investors that the payments they received at the end of the 90-day term of their investment were funded by principal invested by other REAL investors.

112.   As referenced above, Burkhalter represented to investors and prospective investors that Drive Planning had purchased real estate that collateralized its obligations to REAL investors.

113.   Defendants created and distributed a brochure entitled "The Drive Planning Portfolio of Real Estate Investments" ("Drive Planning Real Estate Brochure").

114.   On that brochure, Defendants represented that, "The REAL Opportunity not only has partners that we work with to offer bridge loans and profit sharing in their real estate deals, but also has the full support of the assets of Drive Planning's own Portfolio of REAL Estate Investments."

115.   That representation was false and misleading in at least two respects.

116.   First, Defendants' "bridge loans and profit sharing" deals with supposed "partners" were extremely limited.  Defendants used a miniscule share of the REAL funds for bridge loans and profit-sharing deals with partners.

117.   The Drive Planning Real Estate Brochure was also false and misleading in referring to Drive Planning's supposed "Portfolio of REAL Estate Investments."  The brochure lists 23 properties, but only a few of them are titled in the name of Drive Planning, while others are titled to Burkhalter individually. Moreover, there is no documentation showing how any of these properties secured Drive Planning's obligations to REAL investors.

118.   Defendants misled investors by omitting to disclose Burkhalter's use of investor funds to fund his purchases of luxury goods and services.

119.   Defendants further misled investors by omitting to disclose their use of investor funds to pay commissions to Drive Planning sales agents.

120.   Defendants further misled investors by omitting to disclose their use of investor funds for other Drive Planning business expenses.

121.   Defendants further misled investors and prolonged the scheme by producing videos in which Burkhalter touted the supposed bank balances and properties that, he said, proved Drive Planning's legitimacy, when he knew that the REAL program had been a Ponzi scheme from its inception.

27

## Relief Defendants Received Proceeds of the Ponzi Scheme

### *Jacqueline Burkhalter*

122.   Relief Defendant Jacqueline Burkhalter was married to Burkhalter while Burkhalter operated his Ponzi scheme.

123.   Burkhalter used at least $6,603,088 in Drive Planning funds to purchase real estate titled in the names of Todd and Jacqueline Burkhalter.

124.   On June 1, 2023, Jacqueline Burkhalter filed a divorce action against Burkhalter in the Superior Court of Fannin County, Georgia.

125.   In her complaint, Jacqueline Burkhalter pled for a forensic accounting of Drive Planning so that the assets of Drive Planning could be considered in the equitable distribution of marital property.

126.   On June 3, 2024, the parties reported to the Superior Court that they had reached a settlement.

127.   In addition to the real estate, Jacqueline Burkhalter received at least $1,232,300 in additional cash transfers from Drive Planning, and another $2,122,018 in transfers from Relief Defendant The Burkhalter Ranch.

128.   Jacqueline Burkhalter does not have a legitimate claim to the above-described assets because she provided nothing of value in return for them.

28

### *Burkhalter Ranch Corporation*

129.   Relief Defendant Burkhalter Ranch Corporation received ill-gotten funds from the above-described Ponzi scheme.  Drive Planning paid at least $5.8 million to purchase properties in the Burkhalter Ranch Corporation's name.  From September 2020 through June 2024, Burkhalter Ranch received an additional $17.1 million in cash transfers from Drive Planning.

130.   Because it provided nothing of value in return for these transfers, Burkhalter Ranch does not have a legitimate claim to those assets.

### *Drive Properties*

131.   Relief Defendant Drive Properties received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $777,000 for properties, much of which came from investor funds, and titled those properties in Drive Properties' name.

132.   Because it provided nothing of value in return for these properties, Drive Properties does not have a legitimate claim to those assets.

### *Drive Gulfport*

133.   Relief Defendant Drive Gulfport received ill-gotten funds from the above-described Ponzi scheme.  Specifically, Drive Planning paid at least $944,118

for property, much of which came from investor funds, and titled that property in Drive Gulfport's name.

134. Because it provided nothing of value in return for that property, Drive Gulfport does not have a legitimate claim to that asset.

*TBR*

135. Relief Defendant TBR received ill-gotten funds from the above-described Ponzi scheme. Specifically, TBR received $352,000 in cash transfers from Relief Defendant Burkhalter Ranch. In addition, Drive Planning paid at least $900,000 for property, much of which came from investor funds, and titled that property in TBR's name. Additionally, Drive Planning transferred at least an additional $12,307 in cash to TBR.

136. Because it provided nothing of value in return for the property and cash transfers, TBR does not have a legitimate claim to those assets.

137. In equity, Relief Defendants should disgorge the ill-gotten funds that they received, for the benefit of victims of the Ponzi scheme.

## Current State of the Scheme

138.   On June 10, 2024, Defendants represented to the SEC that they would accept no new investments in REAL, would not pay amounts due to REAL investors, and would not pay commissions to sales agents.

139.   Despite that pledge, Defendants paid sales commission on June 21, 2024.

140.   On information and belief, on July 23, 2024, Burkhalter sent an email to Drive Planning sales agents, advising that the SEC was "reviewing" the REAL investment program, and falsely suggesting that Drive Planning could get investors "their payments in a timely manner" but for the SEC's "review."

141.   In truth, as Burkhalter is aware, any such continued payments would necessarily constitute a continuation of the Ponzi scheme, with Burkhalter continuing to misrepresent payments to investors as coming from profits, rather than from money invested by others.

142.   Burkhalter still has control over the tens of millions of dollars currently in Drive Planning's bank accounts, as well as over the tens of millions of dollars' worth of real estate and other property purchased with investor funds.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

143.   Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

144.   Beginning in or around 2020 and continuing through the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

145.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud.

146.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

147.   Paragraphs 1 through 142 are hereby realleged and incorporated herein by reference.

148.   Beginning in or around 2020 and continuing through the present, Defendants, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

      a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

149.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act and Sections (a), (b), and (c) of Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]

150.   Paragraphs 1 through 142 are hereby re-alleged and are incorporated herein by reference.

151.   Between in or around 2020 and the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

      a.      employed devices, schemes, and artifices to defraud;

      b.      made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.      engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

152.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

34

153.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

### COUNT IV – CONTROL PERSON LIABILITY (FRAUD)

**Violations of Section 20(a) of the Exchange Act**
**[15 U.S.C. § 78t(a)]**
**(Against Burkhalter)**

154.    Paragraphs 1 through 153 are realleged and incorporated by reference herein.

155.    At all times relevant hereto, Defendant Burkhalter controlled Drive Planning for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

156.    By engaging in the conduct alleged above, Defendant Burkhalter is liable as a control person for Drive Planning's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

### COUNT V – DISGORGEMENT
### (Against Relief Defendants)

157.    Paragraphs 1 through 156 are realleged and incorporated by reference herein.

158.    As alleged above, Defendants violated the federal securities laws by engaging in fraudulent activity and misappropriating substantial investor assets.

159.    Defendants, directly or indirectly, transferred funds to Relief Defendants, including by sending funds to Relief Defendants and paying for property in the name of Relief Defendants.  Relief Defendants do not have a legitimate claim to the assets Defendants transferred to them.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

A temporary restraining order and preliminary and permanent injunctions enjoining the Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2), (a)(3)].

### II.

An order barring Burkhalter from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)][15 U.S.C. § 77t(e) and 15 U.S.C. § 78u(d)(2)].

**III.**

An order requiring an accounting by Defendants of the amounts raised and the use of proceeds from the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**IV.**

An order requiring an accounting by each Relief Defendant of the amounts received from Defendants and an order that they disgorge such amounts plus prejudgment interest.

**V.**

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

**VI.**

An order freezing the assets of Defendants pending further order of the Court.

**VII.**

An order freezing real estate assets of Relief Defendants and any assets derived, directly or indirectly, from amounts received from Drive Planning.

## VIII.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

## IX.

An order expediting discovery.

## X.

The appointment of a Receiver to take charge of Drive Planning and its affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

## XI.

An order requiring Burkhalter to surrender all passport(s) issued to him to the Clerk of Court and barring him from applying for or accepting any additional passports and barring him from traveling outside the United States pending resolution of this case on the merits.

## XII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may

be so tried.

This 13th day of August, 2024.

Respectfully submitted,

*/s/Pat Huddleston II*
Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984
huddlestonp@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Harry B. Roback
Senior Trial Counsel
Georgia Bar No. 706790
robackh@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7616
Facsimile: *4048427679@fax.sec.gov*

12/20/23 15:38

# FedEx ®

**This envelope is only for FedEx Express® shipmen**

You can help us get your packag

items securely. Need





SHIP DATE: 22AUG24
ACTWGT: 2.00 LB
CAD: 30022232/INET4535

BILL SENDER

ORIGIN ID:MPBA
JENNIFER PEREZ CULMO
DAMIAN AVILA
1000 BRICKELL AVENUE
SUITE 1020
MIAMI, FL 30131
UNITED STATES US
(305) 371-3960

TO NORTHERN DISTRICT OF ILLINOIS
EVERETT MCKINLEY DIRKSEN US COURT
219 SOUTH DEARBORN STREET

CHICAGO IL 60604
(305) 371-3960

REF DRIVE PLANNING, LLC
INV:
PO:
DEPT:

FedEx
Express

FRI - 23 AUG 5:00P
STANDARD OVERNIGHT

60604
ORD
IL-US

TRK# 7781 3572 6459

XN CHIA

0823240727 79